UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Milburn Harper, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 16 CV 6941 |
| v. | ) |
| | ) Honorable Joan B. Gottschall |
| Bob Rohrman Pre-Owned Car Superstore | ) |
| d/b/a Rohr-Max, Inc., an Illinois corporation, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Milburn Harper ("plaintiff" or "Harper") worked as a sales associate for a used car dealership, Defendant Bob Rohrman Pre-Owned Car Superstore d/b/a Rohr-Max, Inc., ("defendant" or "Rohr-Max") for a little more than five months in 2013. *See* Pl.'s Am. Stmt. of Undisputed Material Facts ("ASUMF") ¶¶ 5, 6, 33, ECF No. 75; to Pl.'s Am. Stmt. of Undisputed Material Facts ("Am. Resp. to ASUMF ") ¶¶ 3, 10, 36–39, ECF No. 79. Harper was 63 years old during most of his employment and was the oldest sales associate at Rohr-Max. ASUMF ¶¶ 1, 6; Am. Resp. to ASUMF ¶ 10. Harper has sued Rohr-Max for violating the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., alleging disparate treatment and disparate impact claims. Rohr-Max moves for summary judgment, arguing primarily that Harper has identified no similarly situated comparators, that much of the treatment about which he testified at his deposition does not qualify as adverse employment action under the ADEA, and that his deposition testimony is insufficient to create a fact issue on his hostile work environment claim. For the reasons that follow, the court grants defendant's motion in part and denies it in part.

1

# I. FACTS

At summary judgment, the court views the facts in the light most favorable to Harper and draws all reasonable inferences in his favor. *See* Part II, *infra*. The court recites the facts accordingly, noting certain disputes for clarity.

## A. Harper's Background and Hiring

Before he applied to Rohr-Max (exactly how long before he applied is unclear), Harper worked at a nearby Ford dealership associated with Rohr-Max's parent company "for a short time." Am. Resp. to ASUMF ¶ 1; *but see id.* ¶ 5 (partially disputing the precise nature of the relationship between the separate company). He left the Ford dealer "because he was promised a demo car and did not get one." Am. Resp. to ASUMF ¶ 2.

When he applied to Rohr-Max on March 20, 2013, Harper had over 35 years of experience in the auto sales industry, including experience working as a finance manager. Am. Resp. to ASUMF ¶ 4; ASUMF ¶ 5. Todd Nelson ("Nelson"), Rohr-Max's then-general manager, interviewed and hired Harper. ASUMF ¶¶ 7–10. Nelson "was unaware of Plaintiff's age at the time of his hiring."[1] Am. Resp. to ASUMF ¶ 8.

Harper worked on commission; he did not receive a salary. ASUMF ¶ 12. He bargained with Nelson for and obtained two things as conditions of employment. Am. Resp. to ASUMF ¶ 8. First, Rohr-Max gave him a demo car. *Id.*[2] Second, Rohr-Max allowed him to be absent without pay (Rohr-Max calls this vacation time) from July 4–9, 2013, for a previously scheduled family commitment. Am. Resp. to ASUMF ¶ 8; ASUMF ¶ 14.

---

[1] The parties dispute whether Harper began working for Rohr-Max on March 22 or 25, 2013. *See* ASUMF ¶ 17. This dispute is not material to any fact of consequence here.

[2] Rohr-Max points to evidence that sales associates were ordinarily ineligible for a demo car until they worked at Rohr-Max for 90 days while Harper testified that a sales associates' experience determined eligibility. *See* ASUMF ¶ 16 and materials cited. This dispute is not material, and to the degree it is, the court resolves it in Harper's favor.

## B. Rohr-Max's Dress Code, Leave Policy, and Attendance Policy

Harper understood that Rohr-Max had a leave policy requiring employees to show up on time for work. ASUMF ¶¶ 20–21. Harper also received a copy of Rohr-Max's written dress code policy when he was hired. ASUMF ¶¶ 18–19. The dress code listed, exhaustively, examples of acceptable attire for men such as suits, ties, sport coats, and dress shirts. Def. Ex. J. at 1, ECF No. 61-10. Examples of unacceptable attire for men included jeans, shorts, and t-shirts. *Id*.

How and when sales associates began earning vacation time is disputed. Rohr-Max points to a written pay plan signed by Harper on March 21, 2013, Def. Ex. F. ("Pay Plan") at 1, ECF No. 61-6. stating that sales associates received one week of vacation time after working for Rohr-Max for a year. ASUMF ¶¶ 12, 13. This dispute makes little practical difference because Harper worked strictly on commission. ASUMF ¶ 12; Pay Plan 1. Regarding sick time, Nelson confirmed at his deposition that Rohr-Max had a policy and procedure for requesting sick time, including a written form, but he did not provide details such as how many sick days employees receive. *See* Nelson Dep. 43–46, ECF No. 61-4 Ex. D; *see also* Am. Resp. to ASUMF ¶ 13 (citing Nelson Dep.). Nelson referenced an employee handbook that might shed further light on the policies at his deposition, but it has not been made part of the summary judgment record. *See* Nelson Dep. 45. Viewed favorably to Harper, Nelson's testimony establishes that Rohr-Max allowed sales associates to take sick days during their first year of employment with manager approval. *See* Nelson Dep. 44–46. The "policy and procedure for calling in sick was for the sales associate to call the sales manager, or whatever supervisor was available, before the start of their shift that day to let them know the sales associate would be out." Am. Resp. to ASUMF ¶ 14 (undisputed fact).

### C. **Harper's Tenure at Rohr-Max**

*1. General Working Conditions and Leave at Rohr-Max*

Sales associates generally worked five days a week. Am. Resp. to ASUMF ¶ 11. They typically worked "long" days twice a week, meaning a 12-hour day from opening at 9:00 a.m. to closing at 9:00 p.m. Am. Resp. to ASUMF ¶ 11. Sales associates could change their shifts; the parties dispute how easy it was to make a change. Am. Resp. to ASUMF ¶ 12.

Sales associates obtained leads in three ways: "walk-ins, phone pops, and internet leads." Am. Resp. to ASUMF ¶ 17. Associates took walk-ins on a first-come, first-serve basis. Am. Resp. to ASUMF ¶ 18. When potential customers called the dealership, a receptionist assigned the call on a rotating basis unless the call came in after 6:00 p.m., in which case one of the sales associates answered the call directly. Am. Resp. to ASUMF ¶ 19. There is a dispute over how internet leads were distributed, though it appears to be undisputed that managers became involved at least in redistributing internet leads when a sales person left Rohr-Max, *compare* Remington Dep. 8:20–9:11, ECF No. 61-12 Ex. L, cited in Am. Resp. to ASUMF ¶ 20, *with* Nelson Dep. 51:2–6. Resolving this dispute for Harper, a manager distributed internet leads to sales associates. Am. Resp. to ASUMF ¶ 20. Fresher internet leads were considered more valuable. Am. Resp. to ASUMF ¶ 21.

*2. Harper's Pitch Book and "Spin Move"*

Harper kept a "pitch book" with photos and other mementos he used to build a rapport with potential customers. Am. Resp. to ASUMF ¶ 22. When he closed a deal, Harper "did a jump and spin move to celebrate his success." Am. Resp. to ASUMF ¶ 23.

*3. Discriminatory Conduct*

According to Harper's testimony (much of which is disputed), Nelson regularly told Harper to "hurry up, old man," and warned him not to "break a hip" when he did his spin move. Am. Resp. to ASUMF ¶ 24. He was "admonished in front of customers for his attire even when it did not violate the dress code, and for being late even when he was timely." Am. Resp. to ASUMF ¶ 27.

Harper was regularly forced to split commissions with younger sales associates who were not involved in his deals. Am. Resp. to ASUMF ¶ 26. Rohr-Max, at Nelson's direction, did not allow Harper to answer the phone after 6:00 p.m. during the second half of the summer of 2013. Am. Resp. to ASUMF ¶ 34.

On April 23, 2013, Jack Cieslak ("Cieslak") a Rohr-Max manager, removed Harper from a deal he helped close, denying him a commission for it. Am. Resp. to ASUMF ¶ 25. About three months later, on or around July 18, 2013, Cieslak assigned Harper 20 pages of internet leads; each was approximately a year old.[3] Am. Resp. to ASUMF ¶ 30. On or before August 10, 2013, a picture of Harper at a much younger age was taken from his pitch book. Am. Resp. to ASUMF ¶ 31; *see also* Pitch Book Photo, Aug. 10, 2013, ECF No. 77-3 at MH109 (p. 21 of 22) Ex. 5 (photo taken by Harper showing the pitchbook photo on display). The photo was displayed in Nelson's office for co-workers and customers to see. Am. Resp. to ASUMF ¶ 31. Harper testified that he felt the photo was displayed to undermine him with customers and staff and to intimidate him. *See* Harper Dep. 234:12-20, ECF No. 61-1 Ex. A. A reasonable jury reviewing the photo in the record, ECF No 77-3 at MH109 (p. 21 of 22) Ex. 5, could certainly so find.

---

[3] The deposition testimony cited in ¶ 30 of Am. Resp. establishes that these leads were reassigned from a recently departed salesperson.

Also, in August 2013 Rohr-Max required Harper to attend sales training at "Rohrman University" during a major sales promotion and competition. Am. Resp. to ASUMF ¶ 32.

   *4. Harper Complains to Rohr-Max*

Harper complained to Rohr-Max's sales manager about being wrongly singled out for a dress code violation. Am. Resp. to ASUMF ¶ 29. At his deposition, Harper admitted that he never complained in writing and indicated that the sales manager to whom he complained was named Raul; Harper could not recall his surname. *See* Harper Dep. 90, 97–98. He also complained about the day-to-day discriminatory treatment he experienced. Am. Resp. to ASUMF ¶ 29. Finally, Harper complained to J.R. Rohrman (the son of the person for whom the dealership is named) about being forced to go to duplicate training in August 2013. Am. Resp. to ASUMF ¶ 33.

**D. The End of Harper's Employment**

Due to the pressure and discrimination he was experiencing, Harper requested leave in writing from Saturday, August 31–September 10, 2013. Am. Resp. to ASUMF ¶ 35; Leave Request Form, ECF No. 61-15, Ex. O (vacation request form with handwritten request for sick time due to pressure and stress). Harper made the request on or around Thursday, August 29, 2013. ASUMF ¶ 27. Nelson, according to Harper, laughed at him and threw the request form in his face. Am. Resp. to ASUMF ¶ 35. Harper believed that he was requesting sick time rather than vacation time, and the handwritten annotations on the form mention sick time specifically. *See* ASUMF ¶ 29

Harper left work early that day, August 29, 2013, ASUMF ¶ 31 (undisputed), and filed a charge of discrimination with the Equal Employment Opportunity Commission, ASUMF ¶ 32. On each of the following four days, August 29–September 1, 2013, he called Rohr-Max to report

that he was sick. ASUMF ¶¶ 31, 33; Am. Resp. to ASUMF ¶¶ 36, 37. Rohr-Max claims that it never received these calls and claims that Harper abandoned his job. ASUMF ¶ 33. Harper's version must prevail at summary judgment.

In the middle of the night on or around September 1, 2013, someone performed a self-help repossession, taking Harper's demo car from his home to Rohr-Max. Am. Resp. to ASUMF ¶ 38. His employment having ended, Harper had to walk to Rohr-Max to retrieve his personal belongings. Am. Resp. to ASUMF ¶ 39.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party–but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary") (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a

genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted)). Summary judgment is warranted when the nonmoving party cannot establish an essential element of his case on which he will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. DISPARATE TREATMENT CLAIMS

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Rohr-Max contends that Harper cannot produce sufficient evidence to warrant a trial on his ADEA disparate treatment claims. To withstand defendant's summary judgment motion, Harper must produce evidence from which a reasonable jury could find, "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Skiba v. Ill. Cent. R.R. Co.,* 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Carson v. Lake Cty.*, 865 F.3d 526, 532 (7th Cir. 2017)). Unlike Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., the ADEA does not permit recovery on a "mixed-motive" theory. *Id.* (quoting *Carson*, 865 F.3d at 532). Applying these standards to the summary judgment record, Harper identifies sufficient evidence to require a trial on his discrimination claims but not his retaliation claims.

Defendant invites the court to sort the evidence into "direct" and "indirect" categories even as it acknowledges that the approach has been abolished in this circuit. *See* Mem. Supp.

8

Mot. Summ. J. 5–6. Defendant associates the direct method of proof exclusively with Nelson's age-related statements and the indirect method with the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its successors. As defendant acknowledges, the Seventh Circuit overruled in 2016 its prior cases to the extent they relied on the distinction between "direct" and "indirect" methods of proving intentional discrimination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016). The Seventh Circuit took care to stress that its decision did "not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand." *Id.* at 766. The *Ortiz* court was "concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Id.* Instead, "[a]ll evidence belongs in a single pile and must be evaluated as a whole." *Id.* This holding is consistent with *McDonnell Douglas* and its successors. *See Golla v. Office of Chief Judge of Cook Cty.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)) (explaining that after *Ortiz*, the framework remains "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases").

Defendant makes a subtle attempt to revive the approach disapproved in *Ortiz* by quoting selectively from the discussion of *Ortiz* in *Skiba*, *supra*. Here is the *Skiba* language quoted in defendant's memorandum in support of its motion for summary judgment, ECF No. 62 at 5, with language defendant omitted emphasized:

> An ADEA plaintiff may satisfy this burden through two methods. First, she "may proceed by introducing direct *or circumstantial* evidence that her employer took an adverse action against her because of her age." Alternatively, she may use the *McDonnell Douglas* "burden shifting framework."

9

*Skiba*, 884 F.3d at 719 (quoting *Carson*, 865 F.3d at 532–33). As the emphasized language shows, and the *Ortiz* opinion confirms, the evidence of Nelson's age-related statements cannot be sequestered in a box labeled "direct" and considered separately from other evidence of discriminatory intent. *See* Mem. Supp. Mot. Summ. J. 6, 7. Harper approaches the evidence holistically and, in the alternative, under *McDonnell Douglas* in his response out of an abundance of caution, but he specifically argues that the court need not reach the burden-shifting framework . The evidence of plaintiffs' hostile work environment and wrongful discharge theories bleeds together here, so using *McDonnell Douglas* would complicate matters *Ortiz* sought to simplify. The analysis becomes considerably more straightforward if it is "[s]tripped of the layers of tests." *Ortiz*, 834 F.3d at 766 (declining to use *McDonnell Douglas* for this reason); *see also Skiba*, 884 F.3d at 725 (separately analyzing "evidence as a whole" after performing *McDonnell Douglas* analysis).

Turning to the evidence, a reasonable jury could find on this record that Nelson harbored animus toward Harper due to his advanced age. Rohr-Max dismisses Nelson's "old man" and "don't break a hip" comments as stray remarks that, while hurtful, do not evince discriminatory intent. *See, e.g., Cerutti v. BASF Corp.*, 349 F.3d 1055, 1062 (7th Cir. 2003) (discussing "stray remarks," including calling someone "old man," under former direct method), *overruled by Ortiz*, 834 F.3d 760 (7th Cir. 2016). But the court cannot disregard Harper's testimony that Nelson "regularly" made those remarks. Am. Resp. to ASUMF ¶ 24. Rohr-Max makes no effort to contextualize them. *Cf. Skiba*, 884 F.3d at 720 (citing *Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 688 (8th Cir. 2009)) (explaining that discriminatory remarks must be considered in context). Nor does it contextualize Harper's testimony that other Rohr-Max employees frequently called him "Mill-Old" rather than Milburn, Am. Resp. to ASUMF ¶ 24, or

the posting of a photo of Harper on August 10, 2013, in Nelson's office, Am. Resp. to ASUMF ¶ 30; ECF No. 77-3 Pl. Ex 4. Based on his remarks, the jury would be within its rights to infer that Nelson disliked older sales associates. *See Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 901–04 (7th Cir. 2018) (holding that evidence of sufficiently pervasive verbal harassment by supervisors and co-workers required trial on existence of hostile work environment); *Ortiz*, 834 F.3d at 766 (supervisor's statements permitted inference of discriminatory animus).

Additional circumstantial evidence may properly be considered when determining that triable issue exists. *Ortiz*, 834 F.3d at 766–67. Based on Harper's testimony and evidence, a reasonable jury could find that Harper was forced wrongly to split commissions with younger sales associates, that Nelson and others berated him in front of coworkers and customers for violating the dress code but did not enforce the dress code against younger violators, that Harper was assigned internet leads that were more than a year old in July 2013, that Nelson prohibited him from answering incoming calls after 6 pm in the second half of the summer of 2013, and that he was sent in August 2013 to Rohrman University for training that he did not really need as a ruse to deprive him of the chance to participate in a major sales promotion. *See* Am. Resp. to ASUMF ¶¶ 24–28, 30–32. This evidence, while not necessarily independently sufficient to survive summary judgment, adds weight to the inference of intentional discrimination being the but-for cause of Harper's firing. *See Coleman v. Donahoe*, 667 F.3d 835, 861–62 (7th Cir. 2012).

Furthermore, it is undisputed that if Harper's version of events is believed, Nelson's discriminatory animus influenced the decision to fire him. As a case that defendant cites puts it, "[w]here a plaintiff demonstrates that an official with discriminatory animus against him provided factual information or other input that affected the challenged employment decision,

11

summary judgment is improper." *Ingram v. NWS, Inc.*, 1997 WL 688882, at *19 (N.D. Ill. Oct. 23, 1997) (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994) and two additional Seventh Circuit cases).

Rohr-Max argues that Nelson's comments and the other evidence of discriminatory intent do not matter because the record demonstrates that Harper voluntarily abandoned his job. That is Nelson's version of events, ASUMF ¶ 31, but the court cannot credit Nelson's testimony over Harper's at summary judgment.

Harper testified that he called in sick each day after August 29, 2013, until Rohr-Max retrieved his demo vehicle in the middle of the night on or around September 1, 2013. Am. Resp. to ASUMF ¶¶ 36–37 (citing Harper Dep.). Although Harper was out of vacation days, there is at least a genuine dispute over whether Rohr-Max sales associates were allowed to take sick days. In fact, Nelson admitted that he would have allowed Harper to be absent if he believed that Harper was sick. *See* Am. Resp. to ASUMF ¶ 29. Yet on Harper's version of events, Nelson did not stop to determine whether Harper was sick; he dismissed Harper's sick leave request out of hand without hearing his reasons for it and laughed at him. Am. Resp. to ASUMF ¶ 35. A reasonable jury could find from this testimony that Nelson did so for discriminatory reasons. Nelson denies ever seeing Harper's written leave request, but he testified that he would have likely denied it because he had given Harper Memorial Day off, and the dealership was very busy over Labor Day. *See* ASUMF ¶ 29. A jury faced with Harper's testimony that Nelson did not even consider the leave request and laughed at him could consider Nelson's explanation to be evidence of pretext. Furthermore, a jury could reasonably find from Nelson's testimony that he participated substantially in the decision to retrieve Harper's demo car and end his employment (indeed that he recommended terminating Harper), for Nelson

12

confirms that he waited three days (precisely after what is unclear) and then spoke with his supervisor about how to proceed. *See* Nelson Dep. 120:14–20 (cited in Am. Resp. to ASUMF ¶ 39).

Thus, this is not a case like *Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 301 (7th Cir. 1996), in which the employees who made reference to the defendant using stereotyped terms like "old man" did not participate in the plaintiff's firing. *Cf. Crum v. Advocate N. Side Health Network*, 2018 WL 1064990, at *11 (N.D. Ill. Feb. 26, 2018), *aff'd* 733 F. App'x 842 (7th Cir. 2018) (Human Resources personnel rather than managers made decision to fire plaintiff). Here, if it believes Harper's testimony, a reasonable jury could find that Nelson's discriminatory animus "influenced" the decision to terminate Harper. *Cerutti*, 349 F.3d at 1063 (quoting *Shager v. Upjohn*, 913 F.2d 398, 405 (7th Cir. 1990)).

Finally, the court finds wholly unpersuasive Rohr-Max's repeated suggestions that Harper's testimony somehow lacks sufficient weight because it is self-serving. Defendant does not suggest that Harper's testimony is not based on personal knowledge or that it is otherwise inadmissible at trial. *See, e.g.*, Reply 1–2, ECF No. 80. *See also* Fed. R. Evid. 602 (personal knowledge requirement). The Seventh Circuit has "routinely found that a nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion." *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) (collecting cases); *accord. Johnson*, 892 F.3d at 901. The same is true for a plaintiff's deposition testimony generally and in ADEA claims specifically. *Johnson*, 892 F.3d at 921; *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993). On this record, "[t]here is nothing inherently more self-serving about [the plaintiff's] deposition. . .than [the defendant's]. . .witnesses." *Payne*, 337 F.3d at 771. Questions about which witnesses to believe and how much, if any, of their testimony should be credited belong to

13

the jury. Because Harper has demonstrated that genuine fact issues exist on his age discrimination claims, a jury, not this court, must resolve them. *See Coleman*, 667 F.3d at 862 (cautioning court to "resist the temptation to act as jurors when considering summary judgment motions"); *Payne*, 337 F.3d at 771–72 (explaining that a party resisting summary judgment "'need not match [the moving party] witness for witness' or affidavit for affidavit'") (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994)).

But Harper has not pointed to sufficient evidence to warrant a trial on his retaliation claim. In this context, it is helpful to look at the elements of a *prima facie* retaliation case. *See Carson*, 865 F.3d at 536 (failure to establish *prima facie* case sufficient reason to grant summary judgment after *Ortiz*). "To survive summary judgment on a timely retaliation claim, plaintiff must offer evidence of: '(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Skiba*, 884 F.3d at 718 (quoting *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017)).

Harper directs the court to evidence that he complained of the discriminatory treatment to a sales manager at Rohr-Max. Am. Resp. to ASUMF ¶ 39. His deposition testimony shows that he directed verbal complaints to a sales manager named Raul (last name unknown). Harper Dep. 90–98. Harper also complained verbally to J.R. Rohrman about being forced to go to the "Rohrman University" training program. Am. Resp. to ASUMF ¶ 32.

To impose liability for retaliation, "the employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory; it is not sufficient that '[an employer] could or even should have known about [an employee's] complaint.'" *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668–69 (7th Cir. 2006)) (alterations in original). If the employer did not have

actual knowledge of the protected activity, "the timing [of the activity] is irrelevant." *Burton v. Bd. of Regents of Univ. of Wisc. Sys.*, 851 F.3d 690, 698 n.6 (7th Cir. 2017) (discounting four-day gap).

Plaintiff identifies no evidence establishing that Nelson or anyone else involved in the employment decisions he challenges had actual knowledge of his complaints to Raul or J.R. Rohrman[4]. Nelson denied being told of Harper's complaints. Nelson Dep. 72-73. His testimony is undisputed. Harper points to no evidence from which a jury could infer that he knew of Harper's complaints or that Raul, J.R., or anyone else at Rohr-Max reported Harper's complaints to Nelson or anyone else. Because Harper has failed to point to evidence sufficient to get to a jury on a *prima facie* case of retaliation, his retaliation claim must be dismissed. *See Nagle*, 554 F.3d at 1122.

## IV. PLAINTIFF HAS ABANDONED HIS DISPARATE IMPACT CLAIM

In addition to intentional age discrimination, also called disparate treatment, an ADEA plaintiff may proceed on a disparate impact theory. *See* 29 U.S.C. § 623(a)(2); *Smith v. City of Jackson*, 544 U.S. 228, 240, 242–43 (2005). "Claims of disparate treatment may be distinguished from claims that stress 'disparate impact' in that the 'latter involve employment practices that are facially neutral in their treatment of different groups but that fall more harshly on one group than another and cannot be justified by business necessity.'" *Carson*, 865 F.3d at 532 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)) (ellipsis omitted); *but see Kleber v. CareFusion Corp.*, 914 F.3d 480 (7th Cir. 2019) (en banc) (holding that ADEA's disparate impact provision does not apply to outside job applicants).

---

[4]The court also notes that Harper's descriptions of his verbal complaints do not make clear, even with inferences favorable to him, whether he specifically communicated that he believed he was being mistreated based on his age as contrasted with a general complaint of unfairness. *See* Harper Dep. 72–73.

15

Harper pleaded a disparate impact claim in his complaint, ECF No. 1 at 4, but he does not defend it at summary judgment. Defendant gave him an opportunity do so when it laid out the elements of a disparate impact claim in its opening memorandum and argued that plaintiff could not come forward with evidence of disparate impact. Mem. Supp. Mot. Summ. J. 11, ECF No. 62. Harper's summary judgment response discusses only his disparate treatment theories, ECF No. 77 at 5–10. *See* Carson, 865 F.3d at 531–37 (contrasting elements of claims for disparate treatment and disparate impact). This amounts to abandonment by Harper because he neither engages with the substantive legal standard nor points to any summary judgment evidence creating a triable issue material to his disparate impact claim. *See, e.g., Palmer v. Marion Cty.*, 327 F.3d 588, 597–98 (7th Cir. 2003); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996); *see also Mach v. Will Cty. Sheriff*, 580 F.3d 495, 501–02 (7th Cir. 2009) (discussing situations in which a party may properly abandon a claim at summary judgment). Harper's disparate impact claim is therefore dismissed.

## V. CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted in part and denied in part. Plaintiff's disparate impact and retaliation claims are dismissed.

ENTERED:

Dated: March 20, 2019

Joan B. Gottschall
United States District Judge